WEST VIRGINIA CIVIL LIBERTIES
UNION et al., Plaintiffs,

v.

John D. ROCKEFELLER, IV, West Virginia Secretary of State, Defendant.

Civ. A. No. 71-87.

United States District Court,
S. D. West Virginia,
Charleston Division.

Jan. 11, 1972.

David G. Hanlon, Harrisville, W. Va., John J. McOwen, Huntington, W. Va., for plaintiffs.

Chauncey H. Browning, Jr., Atty. Gen., Cletus B. Hanley, Deputy Atty. Gen., Victor A. Barone, Asst. Atty. Gen., Charleston, W. Va., for defendant.

Before BOREMAN, Circuit Judge, and CHRISTIE and KNAPP, District Judges.

CHRISTIE, District Judge:

This cause is before the Court on a hearing on the constitutionality of the redistricting of West Virginia's Congressional Representative Districts. As

a result of a decline in population, evidenced by the 1970 decennial United States Census, West Virginia's representation in the United States House of Representatives was reduced from five to four. As a consequence of this reduction, the West Virginia Legislature enacted a redistricting statute (House Bill No. 929), W. Va. Code Chapter 1, Article 2, Section 3, as amended March 13, 1971, creating four new congressional districts from each of which one of its congressional representatives is to be elected.

The defendant, John D. Rockefeller, IV, is sued in his official capacity as the duly elected Secretary of State of West Virginia. As such, he has numerous statutory duties in connection with the supervision and regulation of nominations and elections to the House of Representatives of the United States Congress. Plaintiffs, with the exception of the West Virginia Civil Liberties Union, are residents of West Virginia and are qualified to vote for the nomination and election of members of the House of Representatives.[1] It is their position that the disparities in the population of the congressional representative districts created by the newly enacted redistricting bill deprive them of the right to have their votes for representatives in Congress given the same weight and influence as the votes of other voters of West Virginia, in violation of Article I, Section 2, of the United States Constitution.

Plaintiffs seek a declaration that the districts as set forth in House Bill 929 are invalid and void. They also request that defendant be enjoined and restrained from conducting or performing any duties in connection with elections from these districts unless and until such districts are legally reconstituted. In the event such districts are not legally reconstituted prior to the next election for the House of Representatives, plaintiffs ask that primary and general elections for the office of representative be conducted at large.

*The Facts*

Subsequent to the compilation of the official 1970 national census by the Bureau of the Census of the United States Department of Commerce, and when it became known that West Virginia's congressional delegation would be reduced from five to four members, the Speaker of the West Virginia House of Delegates appointed a Redistricting Committee for the express purpose of studying redistricting proposals and recommending a redistricting plan to the House of Delegates. This committee, composed of twenty-five members of the House of Delegates, employed Kenneth Smith, a statistician and sociologist, as a general consultant, and Everett F. Thaxton, an attorney, as a legal consultant.

In initiating and evaluating redistricting proposals, the committee utilized the experience and advice of its own membership, which included eight lawyers, five members who were chairmen of other house committees, and five members of the House Judiciary Committee. In addition, the committee gathered information from other states, legislative services, and from extensive public hearings. Mr. Thaxton prepared a report for the committee's guidance in which he set forth the constitutional requirements with respect to congressional districts as contained in the United States Constitution and as applied by the most recent decisions of the United States Supreme Court. Mr. Smith prepared a report for the committee in which he set forth various factual data with respect to redistricting and the population in West Virginia as well as various possible redistricting plans. In addition to these various sources, the committee utilized the services of an IBM

---

1. Two of the plaintiffs, Sheila McOwen and Rita Martorella, reside in what is now, under House Bill 929, the Fourth Congressional District. Charlotte Rolston resides in the First Congressional District and Theodore M. Judy and Virgil A. Peterson reside in the Second Congressional District.

360 Computer which, upon having been fed relevant data, produced redistricting proposals and also evaluated redistricting proposals made by other individuals.

After evaluating the many redistricting proposals from these sources, as well as others, the committee eventually was able to narrow its consideration of the redistricting plans to seventeen, consisting of: (1) All of those plans which were introduced in the form of bills by members of the House, (2) a group of plans suggested for consideration of the committee by Mr. Smith, and (3) three plans submitted by James Kee, an incumbent Congressman from West Virginia's Fifth District, which was the district eliminated by the legislation enacted. Each of these seventeen proposals consisted of districts of very nearly equal population. The plan adopted and now under attack came from the first group. According to the 1970 census report, West Virginia has a total population of 1,744,237. Absolute population equality among West Virginia's four new congressional districts would thus have required a population of 436,059 in each district. None of the seventeen proposals considered by the redistricting committee varied more than one-half of one percent from this "ideal" figure.

These seventeen proposals eventually were narrowed to three, with the committee finally adopting a redistricting plan proposed as House Bill 929 and enacted into law as W. Va. Code Chapter 1, Article 2, Section 3. The districts created by House Bill 929 varied within a population range of 1,536 above and 1,894 below the "ideal" district of 436,059 and the difference between the least and the most populous districts was 3,430. In percentage terms, the most populous district was 0.35% above the *mathe-matical ideal* and the least populated district was 0.43% below.[2]

Other redistricting plans were considered by the committee and one plan, House Bill 1086, considered and rejected by the House of Delegates, contained smaller absolute and relative variances from the ideal district than did House Bill 929, yet it had other overriding frailties. Plaintiffs base their assertion that House Bill 929 is unconstitutional on the fact that other redistricting plans with lesser variances were possible but were rejected, however, they decline to be identified with, or to advocate the adoption of, any of such plans.

*Applicable Law:*

In Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Supreme Court interpreted Article I, Section 2, of the Constitution of the United States [3] to mean that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." In the light of this interpretation, the Court concluded, at p. 18, 84 S.Ct. at p. 535, thusly:

> "While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives."

Thus, while making equal representation for equal numbers of people the "fundamental goal" in any reapportionment plan, the Court nevertheless recognized that there would be situations where the attainment of this laudable goal, as a practical matter, could not be carried to "mathematical precision."

---

[2] The four congressional districts created by House Bill 929, based on a population of 1,744,237, according to the 1970 census, are as follows:

| District | Population | Variance from "ideal" | Percent of variance |
|----------|-----------|------------------------|---------------------|
| First | 436,337 | +278 | +0.06 |
| Second | 436,140 | +81 | +0.02 |
| Third | 434,165 | −1894 | −0.43 |
| Fourth | 437,595 | +1536 | +0.35 |

3. "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

In Reynolds v. Sims, 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964), the Supreme Court, although concerned with the apportionment of a state legislature and the constitutionality of that apportionment under the Equal Protection Clause of the Fourteenth Amendment, applied the "as nearly as is practicable" standard applicable under Article I, Section 2, of the Constitution, which it had declared in *Wesberry* to be controlling in congressional reapportionment. In reference to the "as nearly as is practicable" standard and recognizing the impracticality of arranging districts so that each one would have an identical population, the Court noted that "mathematical exactness or precision is hardly a workable constitutional requirement."

Subsequent reapportionment cases in the Supreme Court dealt primarily with apportionment of state legislatures, however, the Court, in Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), again dealt with a congressional redistricting statute. It is the *Kirkpatrick* case which plaintiffs primarily rely upon in asserting that House Bill 929 is unconstitutional. In this case the Court found that a redistricting statute, with absolute variances within a range of 12,260 above and 13,542 below the ideal district and with the most populous district 3.13% above and the least populated district 2.84% below the mathematical ideal, failed to meet the "as nearly as is practicable" standard set forth in *Wesberry*. In so finding, the Court held that the applicable standard "requires that the State make a good-faith effort to achieve precise mathematical equality" and "unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small."

We perceive no fundamental difference between the standard prescribed in *Wesberry* and that in *Kirkpatrick*. The objective of each is identical—to require allocation of people to each district in equal numbers. While recognizing the practical difficulties to be encountered by the state legislatures in drawing districts to accomplish this, the *Wesberry* Court, nevertheless, cautioned that the presence of difficulties alone was "no excuse for ignoring our Constitution's plain objective," thus implying that any deviations would have to be justified by the State. This was made emphatic by the *Kirkpatrick* Court, and while the *Kirkpatrick* Court also may have made more stringent the standard to be followed by the use of the term with "mathematical precision," that Court made it plain (p. 531, 89 S.Ct. p. 1229) that "limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality or for which justification is shown," are permissible notwithstanding. Thus, where it appears the legislative enactment falls short of achieving absolute equality in population in each district, *Kirkpatrick* places the burden squarely upon the state to show justification for the disparity, as did *Wesberry* by implication. Therefore, since the legislation under attack admittedly does not effect absolute population equality, the crucial issues to be resolved are (a) whether a good-faith effort was made by the state to achieve absolute equality and (b) whether the variations appearing are justifiable under the facts and circumstances in evidence.

We find little or no factual resemblance between the instant case and the *Kirkpatrick* case. In *Kirkpatrick*, it was conceded by the state that a more conforming plan could have been easily fashioned. There the District Court found the legislature did not rely on census figures and that the data it did use was inaccurate; there the District Court found the plan adopted was based on "political" practicality rather than on any real desire to achieve population equality among the congressional districts; there the District Court found the legislature had made no good-faith effort to formulate and adopt a plan of reapportionment that would achieve numerical equality "as nearly as is practicable" among the congressional districts, and

that the plan adopted did not in fact do so; and finally, there the district court found that the legislature had failed to offer any acceptable justification for its derelictions.

 In contrast, the record here reveals the legislation was remarkably free of partisan politics, it having been adopted with genuine by-party support in both the committee and the legislative body. Moreover, no serious attempt was made by the plaintiffs to prove lack of good-faith effort by either the redistricting committee or the legislature itself, and none is apparent to this court from the record. To the contrary, the evidence is overwhelming that a good-faith effort was made to formulate and adopt a plan of reapportionment of the state's congressional districts by the use of the latest federal census and by the use of methods and procedures fairly designed to achieve numerical equality among the districts, in compliance with the Constitution of the United States, as interpreted by the Supreme Court, and which also would be amenable to the contiguity and compactness provisions of Section 4, Article 1, of the West Virginia Constitution, providing that,

> "For the election of representatives to Congress, the State shall be divided into districts, corresponding in number with the representatives to which it may be entitled; which districts shall be formed of contiguous counties, and be compact. Each district shall contain as nearly as may be, an equal number of population, to be determined according to the rule prescribed in the Constitution of the United States."

In determining what effect we should give to the contiguity and compactness provisions of this section of the West Virginia Constitution in the overall consideration of the question before us, we have reviewed the pertinent Supreme Court decisions on the point, including Reynolds v. Sims, 377 U.S. at p. 580, 84 S.Ct. 1362, and Kirkpatrick v. Preisler, 394 U.S. at pp. 535–536, 89 S.Ct. 1225, and while it is true, as argued by the defendant, that the Supreme Court has not as yet categorically rejected compactness *per se* as justification for deviations from equality, nevertheless, we are persuaded that it would do so in a proper case. We believe, however, that such decisions do permit us to hold, as we do, that such a requirement in a state constitution that is otherwise in harmony with the Constitution of the United States, as the Constitution of West Virginia is, may and ought to be taken into account and given appropriate consideration by the legislature, along with all other relevant factors, in its overall consideration of the subject. We find that this is precisely what the West Virginia Legislature has done in the instant case.

Thus, faced with the record as constituted, the plaintiffs are forced to rely, as they do, upon the failure of the legislation under attack to comply literally with the *"mathematical precision"* language of *Kirkpatrick*, but, as previously noted, they do not advocate any specific alternate plan that would produce "markedly reduced variances" among the districts. It is true that plans were suggested with lesser variances than those found in House Bill 929 and this court does not intend by its decision to hold that, contrary to the direction of the Supreme Court, *de minimis* variances are acceptable under the "as nearly as is practicable" limitation, but we do find that the state has carried its burden of explaining and justifying the variances.

Obviously, it would be very difficult to markedly reduce the variances in a plan which, in fact, only varies 0.35% above and 0.43% below the mathematical ideal. Additionally, though marked reduction in the variances involved in House Bill 929 is not possible, the court must recognize that redistricting plans conceivably could be produced which would reduce variances below those contained in any of the proposals thus far presented, but this would be impractical and *Kirkpatrick* does not require it, (p. 533, 89 S.Ct. 1225). Therefore, it is the opinion of the court that where, as in

this case, the legislature has made a clearly demonstrated good-faith effort to achieve mathematical equality among the congressional districts, where such districts are in fact nearly equal with variances of no more than the 0.43% found in House Bill 929 and where other plans contemplate not "marked reductions" but only slight reductions in the variances, the plan enacted satisfies the requirements of the "as nearly as is practicable" standards set forth by the Supreme Court in the *Wesberry* and *Kirkpatrick* cases.

*Conclusion:*

It, therefore, is the opinion of this court that the redistricting plan contained in W. Va. Code Chapter 1, Article 2, Section 3, complies not only with the requirements of Article I, Section 2 of the United States Constitution, but also with the requirements of Article 1, Section 4 of the West Virginia Constitution, and for that reason the relief prayed for must be denied and this action dismissed. An order will enter accordingly.