The STATE OF MONTANA; Stan Stephens, Governor of the State of Montana; Marc Racicot, Attorney General for the State of Montana; Mike Cooney, Secretary of State for the State of Montana; Max Baucus, United States Senator; Conrad Burns, United States Senator; Pat Williams, United States Representative; and Ron Marlenee, United States Representative, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF COMMERCE; Robert A. Mosbacher, Secretary of United States Department of Commerce; Bureau of the Census; Barbara Everitt Bryant, Director of the Bureau of the Census; and Donnald K. Anderson, Clerk of the United States House of Representatives, Defendants.

No. CV 91–22–H–CCL.

United States District Court,
D. Montana,
Helena Division.

Oct. 18, 1991.

Elizabeth S. Baker, Asst. Atty. Gen., Marc Racicot, Atty. Gen., Clay R. Smith, Atty. Gen. Office, State of Mont., Helena, Mont., Kenneth Eikenberry, James M. Johnson, Charles F. Secrest, Office of Atty. Gen., Olympia, Wash., for plaintiffs.

Kris McLean, Asst. U.S. Atty., Sandra M. Schraibman, Susan L. Korytkowski, Mark H. Murphy, U.S. Dept. of Justice, Civ. Div., Michael Murray, Steve Ross, Office of Gen. Counsel, U.S. House of Representatives, Washington D.C., for defendants.

## OPINION AND ORDER

Before O'SCANNLAIN, Circuit Judge, LOVELL, District Judge, and BATTIN, Senior District Judge.

LOVELL, District Judge, and BATTIN, Senior District Judge:

This matter came on for hearing September 3, 1991, before a three-judge-court composed of United States Circuit Judge Diarmuid F. O'Scannlain, United States Senior District Judge James F. Battin, and United States District Judge Charles C. Lovell, on cross-motions for summary judgment and also on Defendants' motion to review Judge Lovell's August 15, 1991, order. Plaintiffs were represented by Marc Racicot, Clay Smith, and Elizabeth S. Baker; and Defendants were represented by Susan L. Korytkowski and Mark H. Murphy. Having fully considered the presentations of the parties and the briefs filed in response to these motions, the court now enters its Opinion and Order.

## PROCEDURAL HISTORY

Plaintiffs commenced this action on May 22, 1991, by filing their complaint for declaratory and injunctive relief, motions for preliminary injunction and for convening of three-judge-court, and affidavits and briefs in support thereof. After considering Plaintiffs' motion for convening of three-judge-court, Judge Lovell, on May 24, 1991, notified the Chief Judge of the Ninth Circuit Court of Appeals that the matter was appropriate for consideration by a three-judge-court.

A status conference with counsel was conducted on June 24, 1991, and the court set down a schedule for the filing and briefing of potentially dispositive motions. During that conference, the parties agreed that this matter could ultimately be submitted for decision on cross-motions for summary judgment. On July 9, 1991, the parties were notified that the other two judges had been designated and that the court intended to set the motion for preliminary injunction for hearing on September 3, 1991.

After denying Defendants' motions to dismiss Plaintiffs' complaint and to dissolve the three-judge-court, by order of August 15, 1991, Judge Lovell set a schedule for the filing and briefing of cross-motions for summary judgment and also the motion to review the August 15, 1991, order. Those motions all came on regularly for hearing before the three-judge-court on September 3, 1991.

## ARGUMENTS

Plaintiffs seek to prohibit Defendants from effecting a reapportionment of the United States House of Representatives for the 1992 congressional election based on the method prescribed by Title 2, United States Code, section 2a. Plaintiffs Stephens, Racicot, and Cooney bring this claim on behalf of all voters of the state of Montana, claiming that the latest apportionment unconstitutionally denies Montana voters equal representation as required by Article I, Section 2 of the Constitution. Plaintiffs Baucus, Burns, Williams, and Marlenee (Congressional Delegation Plaintiffs) claim that the automatic apportionment method deprives them of the opportunity to vote on the decennial apportionment.

Defendants contend that this case is not appropriate for submission to a three-judge-court because it involves apportionment among the states rather than within the states. Defendants also argue that the complaint raises a nonjusticiable political question and that Plaintiffs lack standing to bring either the first or second claims for relief in the complaint. Finally, Defendants argue that even if the court proceeds to the merits of Plaintiffs' claim, the court should find 2 U.S.C. § 2a constitutional. Defendants contend that Congress should not be held to the same exacting standard in apportioning representatives among the states as state legislatures in apportioning representatives within states. Defendants further argue that the court should approve Congress' choice of an apportionment method so long as Congress had a rational basis for that choice.

REVIEW OF AUGUST 15, 1991, ORDER

Before addressing the merits of Plaintiffs' claims, the three-judge-court initially reviews the order previously entered by Judge Lovell. Defendants seek review of the order denying their motion to dismiss Plaintiffs' complaint. Defendants first raised their justiciability and standing arguments in that motion to dismiss. The motion also requested that the three-judge-court be dissolved, claiming that the issues raised by Plaintiffs are not appropriate for submission to a three-judge-court. The three-judge-court has reviewed the briefs submitted by the parties relating both to Defendants' original motion to dismiss and to Defendants' motion to review the order entered by Judge Lovell, and has considered the arguments raised at the hearing.

## A. Three–Judge Court

■ Section 2284 of Title 28, United States Code, provides:

A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of Congressional districts or the apportionment of any statewide legislative body.

Plaintiffs filed this action challenging the constitutionality of Congress' apportionment of Congressional districts among the states. Therefore, this matter is appropriate for submission to a three-judge-court.

## B. Political Question

■ The three-judge-court has reviewed the formulations traditionally employed to describe nonjusticiable political questions, and has determined that Plaintiffs' claims do not fall within any of those formulations. Plaintiffs' complaint calls upon this court to interpret the constitution and to decide whether the 1990 apportionment of representatives among the states meets the standards established by Article I, Section 2 of the Constitution. Constitutional interpretation is the responsibility of the judiciary, *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), and this court will not shirk that responsibility.

## C. Standing

■ Plaintiffs allege, in the first count of their complaint, that the current apportionment deprives voters in the state of Montana of equal representation in the House of Representatives. This injury to Plaintiffs' voting power can be traced to the use of an allegedly unconstitutional apportionment method, and there is a substantial likelihood that the injury will be redressed if Congress is forced to adopt a constitutional method.

Congressional Delegation Plaintiffs allege, in the second count of their complaint, that the automatic apportionment method deprives them of their opportunity to vote on legislation effecting the decennial census. This injury can be traced to the automatic nature of the current apportionment statute, and there is a substantial likelihood that the injury will be redressed if the court grants Plaintiffs the relief sought and declares the automatic apportionment statute unconstitutional. Plaintiffs have established their standing as to both counts of their complaint.

For the forgoing reasons, the three-judge-court hereby approves and adopts Judge Lovell's August 15, 1991, order de-

nying Defendants' motion to dismiss and to dissolve three-judge-court.

## CROSS–MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is properly granted under Rule 56(c), Federal Rules of Civil Procedure, if "the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *California Architectural Building Products, Inc. v. Franciscan Ceramics,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Both parties having agreed that there are no genuine issues of material fact in dispute, the court must now decide the legal issues raised by the parties.

One of the greatest controversies during the Constitutional Convention of 1787 concerned the issue of how representation would be apportioned in the new government's legislative body. 1 *Records of the Federal Convention of 1787* 321 (Farrand ed. 1911) (hereinafter *Farrand*). The more populous states argued that representatives should be apportioned according to population, and the less populous states argued that each state should have equal representation. When the inability to resolve this issue threatened to end the convention without formulating a constitution, Benjamin Franklin proposed what has become known as the "Great Compromise." *Id.* at 488. That compromise resulted in the creation of the two houses which make up this nation's current legislative branch. According to the framers, the House of Representatives would be apportioned on the basis of population and would represent the people, and each state would be represented equally in the Senate which would therefore represent the states. *Id.* at 462. As summed up by William Samuel Johnson of Connecticut,

> [i]n *one* branch the *people*, ought to be represented; in the *other,* the *States.*

*Id.* (emphasis in original).

It is evident from the record of the debates at the Convention that "when the

delegates agreed that the House [of Representatives] should represent 'people' they intended that ... the number [of Congressional seats] assigned to each State should be determined solely by the number of the State's inhabitants." *Wesberry v. Sanders,* 376 U.S. 1, 13, 84 S.Ct. 526, 533, 11 L.Ed.2d 481 (1964).

> If the power is not immediately derived from the people, in proportion to their numbers, we may make a paper confederacy, but that will be all.

*Id.* at 10 (citing *Farrand,* at 472).

Article I, Section 2 of the Constitution, one of the products of the "Great Compromise," provides for the apportionment of representatives to the House of Representatives among the several states "according to their respective [n]umbers." Section 2 also provides for a decennial determination of the number of people in each state, and thus of the number of representatives to which each state is entitled.

The method of apportioning representatives among the states has been a source of continuing controversy. In accordance with the mandate of Article I, Section 2, Congress debated and chose the method to be used for each decennial apportionment until 1920, when Congress failed to enact a reapportionment measure. That failure led Congress to enact a reapportionment statute in 1941 which specifies the statistical "method of equal proportions," also known as the "Hill method," as the chosen apportionment formula, and makes the reapportionment process self-executing. 2 U.S.C. § 2a. Congress determined that the apportionment of the seats remaining after the assignment of one seat to each state shall be based on the equal proportions method, 2 U.S.C. § 2a(a), and delegated the function of apportioning House seats to the Secretary of Commerce, who takes the decennial census. 13 U.S.C. § 141(a). Although there has been extensive congressional debate *following* most of the decennial censuses conducted since the adoption of the automatic method in 1941, Congress has not since conducted such inquiry *before* the decennial processes began. Here, the cur-

rent apportionment was ordered without consideration of its merits by Congress.

In 1990, the Secretary of Commerce conducted the decennial census and notified the President of the results of that census. The President transmitted the results to Congress, and the Clerk of the House of Representatives notified each state of the number of representatives to which its residents were entitled. The state of Montana was notified that it is entitled to one representative in the House of Representatives.[1] That determination led the state of Montana to file the instant suit, challenging the constitutionality of 2 U.S.C. § 2a.

No state has heretofore turned to the judicial branch to challenge the method employed by Congress to apportion representatives among the several states. This case therefore raises an issue of first impression. Courts have frequently been faced with challenges to the apportionment of congressional seats within states. The Supreme Court developed the principle of equal representation for equal numbers of people as the standard for deciding such challenges in *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Plaintiffs contend that the apportionment principles announced in *Wesberry* and other cases involving intrastate redistricting apply to Congress' duty to apportion seats among the states. The Defendants, however, contend that *Wesberry* and its progeny, which interpret Article I, § 2 in the context of intrastate redistricting, do not apply to the national apportionment issue. They argue that the "one person, one vote" standard is a mathematical impossibility with respect to the interstate apportionment of seats in the House of Representatives because Congress must adhere to existing state boundaries and each state must have at least one representative. The court agrees with Plaintiffs that there is no principled reason why the standards set forth in *Wesberry* should not apply to the apportionment of representatives by Congress, despite this mathematical impossibility.

Article I, Section 2 provides no textual basis upon which to distinguish the duties of Congress from the duties of the state legislatures in this regard. Article I as a whole concerns the powers and responsibilities of the federal legislative branch, rather than state legislatures. The plain language of Article I, Section 2 specifically refers to apportionment among the several states. Clearly, any duty imposed upon state legislatures by Article I, Section 2 is also imposed upon Congress.

The principles set forth in *Wesberry* apply with equal force to Congress' apportionment of representatives among the several states. The Supreme Court in *Wesberry* construed Article I, Section 2 in light of the history of the debates leading to the "Great Compromise" and determined that "equal representation for equal numbers of people" is the "fundamental goal for the House of Representatives." *Id.* at 17, 84 S.Ct. at 535. That debate centered on the issue of how seats should be apportioned to states, not on how state legislatures should draw districts within states. Thus, when James Wilson of Pennsylvania stated that "equal numbers of people ought to have an equal number of representatives ...," and representatives "of different districts ought clearly to hold the same proportion to each other, as their respective constituents hold to each other," 1 *Farrand* 180, *quoted in Wesberry*, 376 U.S. at 11, 84 S.Ct. at 531, he was referring to apportionment of House seats among the states rather than within the states. *See also Wesberry*, 376 U.S. at 31, 84 S.Ct. at 542 (Harlan, J., dissenting) ("[T]he statements approving population-based representation were focused on the problem of how representation should be apportioned among the States in the House of Representatives. The Great Compromise concerned representation *of the States* in the Congress.")

---

1. According to the Census results, Montana has a population of 803,655. Montana was formerly apportioned two representatives. This reapportionment designates one representative for Montana as a single district. Thus, this single representative would represent 803,655 people. This single Congressional district contains the largest number of persons per representative in any district.

The rationale underlying the *Wesberry* opinion actually has more relevance to the national apportionment issue than to intrastate redistricting. In essence, the Supreme Court simply precluded any state from indirectly violating the national standard of "equal representation for equal numbers of people" through its intrastate redistricting actions, stating that

> It would defeat the principle solemnly embodied in the Great Compromise—equal representation in the House for equal numbers of people—for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others.

*Wesberry*, 376 U.S. at 14, 84 S.Ct. at 533. Clearly, the Supreme Court's decision in *Wesberry* with regard to intrastate redistricting was premised upon the notion that the "one person, one vote" standard ultimately governs, both at the national and the state levels. Therefore, Defendants' argument that the principles of *Wesberry* do not apply to congressional apportionment among the states is without merit.[2]

Article I, Section 2 imposes upon Congress the same duty to "meet the standard of equal representation for equal numbers of people as nearly as is practicable," *Wells v. Rockefeller*, 394 U.S. 542, 544, 89 S.Ct. 1234, 1236, 22 L.Ed.2d 535 (1969), when apportioning Congressional districts that it imposes upon state legislatures.

Population equality between districts is the "preeminent, if not the sole, criterion on which to adjudge constitutionality." *Chapman v. Meier*, 420 U.S. 1, 23, 95 S.Ct.

751, 764, 42 L.Ed.2d 766 (1975). "That is the high standard of justice and common sense which the Founders set for us." *Wesberry*, 376 U.S. at 18, 84 S.Ct. at 535. "Adopting any standard other than population equality ... would subtly erode the Constitution's ideal of equal representation." *Karcher v. Daggett*, 462 U.S. 725, 731, 103 S.Ct. 2653, 2659, 77 L.Ed.2d 133 (1983) (citation omitted).

The "as nearly as is practicable" standard requires that a "good-faith effort [be made] to achieve precise mathematical equality" between districts. *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969). Only population variances which "are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown" are tolerated by Article I, Section 2. *White v. Weiser*, 412 U.S. 783, 790, 93 S.Ct. 2348, 2352, 37 L.Ed.2d 335 (1973) (quoting *Kirkpatrick*, 394 U.S. at 531, 89 S.Ct. at 1229). In making this determination, the Supreme Court has stated that a "court must consider whether the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population." *Karcher*, 462 U.S. at 730, 103 S.Ct. at 2658. Good faith is lacking when the use of a different apportionment scheme could easily reduce population variances. *Doulin v. White*, 528 F.Supp. 1323, 1329 (E.D.Ark.1982).

■ A party challenging the apportionment of Congressional districts bears the burden of demonstrating that the population differences among districts could have

---

2. In fact, in *Federation for American Immigration Reform v. Klutznick*, the court emphasized that while the *mathematical* notion of "one person, one vote" is not strictly applicable to the national issue, the underlying *Constitutional* principle of equal representation for equal numbers of people applies to both national apportionment and to intrastate redistricting. 486 F.Supp. 564, 577 (D.D.C.1980). As Daniel Webster stated in his address to Congress in 1832,

> The Constitution ... must be understood, not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring *of Congress* to make the apportionment of Representatives *among the*

several States according to their respective numbers, *as near as may be.* That which cannot be done perfectly must be done in a manner as near perfection as can be.

M. Balinski and H. Young, *Fair Representation: Meeting the Ideal of One Man, One Vote,* at 31 (1982) (first and second emphases added, third emphasis in original). Congress itself has recognized that the "one man, one vote" principle set forth in intrastate districting cases has at least some application to national reapportionment decisions. *See The Decennial Population Census and Congressional Apportionment,* H.R.Rep. No. 1314, 91st Cong., 2d Sess., at 5–6 (1970).

been avoided. If the party challenging the apportionment scheme establishes "that the population differences were not the result of a good-faith effort to achieve equality," the burden then shifts to the defendant to prove "that each significant variance between districts was necessary to achieve some legitimate goal." *Karcher*, 462 U.S. at 730–31, 103 S.Ct. at 2658. "[N]either history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes." *Reynolds v. Sims*, 377 U.S. 533, 579–80, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506 (1964).

■ Plaintiffs contend that the goal of equal representation for equal numbers of people can only be met by adopting a reapportionment method which results in the smallest absolute difference between the number of persons per representative. Plaintiffs have presented expert testimony that the Dean method, also known as the method of harmonic means, best achieves that goal because it was expressly designed to, and does in fact, calculate reapportionment to result in the smallest *absolute* difference between numbers of persons per representative. (Tiahrt Affidavit at p. 3. *See also* Declaration of Ernst at p. 6.) The Dean method also best accomplishes the goal of creating districts closest to the ideal district size. (Tiahrt Affidavit at p. 5.) The Hill method can never meet the criteria proposed by Plaintiffs, because its express objective is to minimize the *relative* difference between the number of persons per representative and the relative difference between each person's share of a representative.[3]

The criteria used by Plaintiffs have been used by other courts applying the equal population standard to intrastate apportionment. *Karcher*, 462 U.S. at 728, 103 S.Ct. at 2657 (variances between the actual districts and the ideal district size and total population difference between largest and smallest districts—range); *Kirkpatrick*, 394 U.S. at 527, 89 S.Ct. at 1227 (variance between actual districts and ideal); *White*, 412 U.S. at 785, 93 S.Ct. at 2350 (variances between the largest and smallest district and the ideal district size, average deviation from the ideal district size, and total population difference between largest and smallest districts—range); *Wells*, 394 U.S. at 540–41, 89 S.Ct. at 1233–34 (maximum deviation above and below the mean district size). No court has actually used the criteria proposed by Defendants to decide whether a good faith effort has been made to achieve equal representation among congressional districts. More importantly, the criteria proposed by Plaintiffs recognizes that the goal of Article I, Section 2 is equal representation, not relatively equal representation.

Courts traditionally look to variances from the ideal district size to determine whether a district is under or over represented. In determining whether avoidable and unjustified variances exist, the court looks to the entire apportionment plan. The court analyzes the disparities between states by comparing the districts in those states to the ideal district, and not to each other.

The ideal district reflects the size of each district if it were possible to truly achieve equal representation for equal numbers of people—the goal mandated by the Constitution. Any difference from the ideal reflects unequal representation. Thus, absolute difference from the ideal district is the proper criterion to use in determining whether Congress has met the goal of equal representation for equal numbers of people. Plaintiffs have met their burden of showing that another recognized and accepted statistical method, besides the Hill method, would more closely meet the constitutional mandate of absolute population equality among districts. The burden

---

3. By arguing that proportions and percentages are the proper criteria, rather than absolute numbers, Defendants ignore the fact that each number represents a person whose voting rights are potentially impacted by the population dis-

parities. There is "no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives." *Wesberry*, 376 U.S. at 18, 84 S.Ct. at 535.

therefore shifts to Defendants to demonstrate that the greater disparity under the Hill method is necessary to achieve some legitimate goal.[4]

Defendants attempt to justify the variances in district size under the Hill method, contending that Congress considered and rejected the Dean method[5] in 1941 when it chose the method of equal proportions. However, a review of the House debates prior to the enactment of 2 U.S.C. § 2a discloses that the Dean method was not given serious consideration by Congress. The debates centered on choosing between the method of major fractions and the method of equal proportions, and there was little or no discussion of other available methods. 87 Cong.Rec. 1071, 1084 (1941). The legislative history does not support Defendants' argument that Congress deliberately chose the Hill method over the Adams and Dean methods since the only choice offered was between Hill and major fractions.

Defendants also contend that Congress determined that relative difference was a better measure of the inequity between district size than absolute population variances. If Congress indeed made that decision it did so without benefit of the Supreme Court's interpretation of Article I, Section 2, since the method of equal proportions was adopted prior to *Wesberry.* Moreover, Congress initially adopted the Hill method in 1941 because it allowed Arkansas to retain its existing congressional seats.[6] Defendants admit that Congress' efforts to deal with reapportionment have been political in nature, involving compro-

mises among the states.[7] Defendants cannot justify the population variances based on Congress' past "considerations of practical politics." *Kirkpatrick,* 394 U.S. at 533, 89 S.Ct. at 1230.

Finally, Defendants argue that considerations of equity and fairness supported the selection of the Hill method in 1941. This position reflects the historical congressional concern with finding a *"mathematically defensible* way to apportion Representatives among the States in compliance with the Constitution." *See The Decennial Population Census and Congressional Apportionment,* H.R.Rep. No. 1314, 91st Cong., 2d Sess., App. B. at 15 (1970) (emphasis added). However, Congressional apportionment is not an issue to be governed by subjective mathematical or equitable concerns; it is strictly a Constitutional matter. Population equality within each district is *the* goal under the Constitution, not *a* goal, as Defendants argue. The Constitution mandates apportionment "among the several States ... according to their respective Numbers," not "according to their respective Numbers and whatever other considerations Congress or its mathematicians may deem appropriate at any given time."

While it is theoretically possible to establish a justification for failure to comply, as far as is practicable, with the constitutional mandate of absolute population equality among districts, *see e.g. Doulin,* 528 F.Supp. at 1330 (projected population changes might, in some circumstances, be a justification that the Supreme Court would

4. The court recognizes that two factors are present in interstate apportionment which mandate differences in district size—the need to maintain state boundaries and to award each state at least one representative. The Dean method complies with those requirements and results in smaller disparities between districts than the Hill method.

5. The court is not including the Adams method in its discussion, since it results in "quota violations," as recognized by the dissent, and therefore does not appear to be a viable alternative.

6. During the debate one congressional delegate, Mr. Cox, presented the issue for discussion as being "whether Arkansas shall lose a representa-

tive and losing one, shall Michigan gain one." 87 Cong.Rec. at 1078.

7. Defendants actually compare Congress' efforts to select an apportionment method to the exercise the framers undertook—the Great Compromise. This comparison effectively demonstrates the fallacy of Defendants' entire argument. The House of Representatives was the *result* of the Great Compromise—one house to be chosen by the people based on population. The Constitution decrees that one house should be chosen on the basis of population, (persons per representative) and Congress cannot ignore that mandate by choosing a method which considers each person's share of a representative.

accept), it is difficult, if not impossible, to do so. This narrow construction of the constitutional apportionment mandate prompted one Supreme Court justice to complain "that the Court rejected 'every type of justification that has been—possibly, every one that could be—advanced.'" *Id.* quoting *Kirkpatrick,* 394 U.S. at 537, 89 S.Ct. at 1232 (Fortas, J., concurring). The justifications offered by Defendants do not satisfy the stringent criteria applied by the United States Supreme Court.[8]

At any rate, Defendants cannot claim that Congress made a good faith effort to achieve the goal of equal representation for equal numbers of people before instituting the most recent reapportionment of representatives because the reapportionment process was automatic, and Congress, in its role as law and policy maker, had no part in the process. Congress, by enacting 2 U.S.C. § 2a in 1941, did not relieve itself of any further obligation to inquire into the Constitutionality of each apportionment decision.[9] It does not place an undue burden upon Congress to require that, once every decade, it apply various accepted statistical methods to the census results and determine which method best meets the Constitutional mandate for population equality among the districts.

By complacently relying, for over fifty years, on an apportionment method which

does not even consider absolute population variances between districts, Congress has ignored the goal of equal representation for equal numbers of people. The court finds that unjustified and avoidable population differences between districts exist under the present apportionment, and

HEREBY ORDERS that Plaintiffs' motion for summary judgment is GRANTED, and Defendants' motion is DENIED as to Count I of Plaintiffs' complaint. Judgment shall enter declaring section 2a of Title 2, United States Code unconstitutional and void, and permanently enjoining Defendants from effecting reapportionment of the House of Representatives under the provisions of that statute. Having decided Count I in favor of Plaintiffs and granted Plaintiffs' request for declaratory and injunctive relief, it is unnecessary for the court to further consider the merits of Count II.

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

I join in the majority opinion to the extent it holds that the three-judge district court was properly convened, that plaintiffs have standing, and that plaintiffs' claims are justiciable.[1] On the merits, however, I am of the view that plaintiffs have failed to show that Congress' present method for allocating House of Representative

**8.** Assuming that Congress's selection of the Hill method was rational in 1941, as defendants argue, the court is not bound to uphold its constitutionality today, as applied to the 1990 census. A statute which was once validly enacted and constitutional may be rendered unconstitutional by a change in the facts or circumstances upon which it was based. *See Leary v. United States,* 395 U.S. 6, 38 n. 68, 89 S.Ct. 1532, 1549 n. 68, 23 L.Ed.2d 57 (1969); *United States v. Carolene Products, Co.,* 304 U.S. 144, 153, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938); *Nashville, C. & S.L. Ry. v. Walters,* 294 U.S. 405, 415, 55 S.Ct. 486, 488, 79 L.Ed. 949 (1935); *Chastleton Corp. v. Sinclair,* 264 U.S. 543, 547, 44 S.Ct. 405, 406, 68 L.Ed. 841 (1924).

In this case, the Supreme Court's ruling in *Wesberry* (interpreting Article I, Section 2) and demographic changes in the United States' population since 1941 constitute sufficient changes in circumstances to call into question the rationality of 2 U.S.C. § 2a today.

**9.** This view somewhat overlaps the issues raised by Count II of Plaintiffs' Complaint for Declara-

tory and Injunctive Relief, concerning the automatic nature of the present apportionment statute. The court believes that Count II may have some merit, but will not address those issues since 2 U.S.C. § 2a has been declared unconstitutional on other grounds.

**1.** To the extent, however, that plaintiffs' second claim alleges that the internal organization or processes of Congress have denied the Montana congressional delegation the opportunity to vote on apportionment issues, it is a non-justiciable political question. *See United States v. Munoz–Flores,* 495 U.S. 385, 110 S.Ct. 1964, 1970, 109 L.Ed.2d 384 (1990) (political question "doctrine is designed to restrain the judiciary from inappropriate interference in the business of the other branches of government"); *see also Armstrong v. United States,* 759 F.2d 1378, 1380 (9th Cir.1985) (matter is justiciable because it "does not require delving into the internal records or workings of Congress").

seats to the states violates the Constitution, and hence I respectfully dissent from the order granting plaintiffs' motion for summary judgment.

## I

The State of Montana, and its governor, attorney general, secretary of state and congressional delegation (the "State"), allege that the equal proportions formula used to allocate House seats among the states violates Article I, Section 2, of the Constitution. In the history of the Republic, Congress has used four different mathematical formulae[2] to apportion House of Representatives seats among the states. Bureau of the Census, U.S. Dep't of Commerce, *Counting for Representation: The Census and the Constitution* 3–5 (1990). Following the 1920 census, Congress failed to reapportion House seats among the states. This failure was due in part to a lack of confidence in the population figures presented to Congress by the Census Bureau, but was also due in part to increasing doubts that the then-used "major fractions" formula accurately assigned House seats to states based on population. H.Rep. No. 1314, 91st Cong., 2d Sess. 16–17 (1970).

Hence in 1929, Congress commissioned the National Academy of Sciences (the "NAS") to determine which mathematical formula for allocating House seats among the states would best accomplish such allocation consistent with the constraint that states cannot be assigned fractions of a representative. *See* Report of the Nat'l Academy of Sciences Comm. on Apportionment (1929), *reprinted in* H.Rep. No. 1314, 91st Cong., 2d Sess. 19–21 (1970). The NAS recommended to Congress that it abandon the major fractions formula and adopt the Hill "equal proportions" formula. *Id.* The committee of four prominent mathematicians convened by the NAS to respond to Congress' inquiry studied five allocation formulae, including all of the formulae before the court in this matter. *Id.*

The NAS study determined that the Hill formula was not only the least biased as between large states and small, but also led to the least percentage discrepancy in "sizes of congressional districts or ... numbers of Representatives per person." *Id.*

In 1941, Congress passed into law a requirement that the method of equal proportions, the Hill formula, was to be used to apportion representatives among the states. *See* 2 U.S.C. § 2a(a). Congress has revisited the issue of allocation methodology several times since 1941. In 1948, Congress commissioned another NAS study, which concurred in the 1929 study, again finding the Hill formula superior. In 1971, a House subcommittee stated that the Hill formula served the objective of keeping "the average number of persons per congressional district ... as nearly equal as possible among the States," and hence declined to change it. H.Rep. No. 1314, 91st Cong., 2d Sess. 5–6 (1970). In 1981, the House considered a bill that would have replaced the Hill "equal proportions" formula with the Hamilton–Vinton formula, but the bill was never passed. In the latest allocation of House seats, conducted earlier this year and based on the 1990 census figures, the Hill formula was used, as it has been since 1941.

## II

The Supreme Court has never set forth the standard for evaluating claims that Congress has misapportioned House seats among the several states. However, as early as *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), voting had been held to be a "fundamental right." *Id.* at 370, 6 S.Ct. at 1071. More recently, the Court has stated: "Our Constitution leaves no room for classification of people in a way that unnecessarily abridges" the right to vote. *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). A court, therefore, should center its inquiry on the question of whether dis-

---

**2.** These are: Jefferson "greatest divisors" (1792–1830); Webster "major fractions" (1840, 1910, and 1930); Hamilton–Vinton "simple rounding" (1850–1900); and Hill "equal proportions" (1941–present).

parities in voting power are "unnecessary." Heightened scrutiny attends allegations of deprivation of voting rights. *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964).

*Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), concerned the mapping of congressional districts within one state and hence is not directly applicable here. Nonetheless, the Court there set forth a burden shifting scheme that provides a helpful analytic framework for evaluating the claims brought before us. Under this scheme, the plaintiff has the initial burden of showing that population differences exist among districts, and, more important, that such "differences were not the result of a good faith effort to achieve equality" and could have been avoided by use of a different districting plan. *Karcher*, 462 U.S. at 731, 103 S.Ct. at 2658. If the plaintiff meets this burden, the burden shifts to the defenders of the districting plan: "[T]he State must bear the burden of proving that each significant variance between districts was necessary to achieve some legitimate goal." *Id.*

### III

Article I, Section 2, of the Constitution, as amended by Section 2 of the Fourteenth Amendment, requires that "Representatives shall be apportioned among the several States according to their respective numbers." The manifest command of this text is that House seats are to be allocated to the states based on population. It is also the clear implication of this text, however, that House seats may not straddle state lines; seats must be apportioned to a particular state. Moreover, Article I, Section 2, also provides that "each State shall have at Least one Representative." Hence, while population is an important factor in allocating House seats, other constraints affect the allocation. Because the Constitution provides for these additional constraints, Justice Harlan observed that it "is not strictly true" that "in allocating Congressmen the number assigned to each State should be determined *solely* by the number of the State's inhabitants." *Wesberry*, 376 U.S. at 26–27 n. 8, 84 S.Ct. at 540 n. 8 (Harlan, J., dissenting) (emphasis added).

Contemporaneous accounts of the drafting of the Constitution similarly evince the Framers' intent that the House be apportioned according to population, subject to the constraints inherent in the Constitution's federal structure. One of the great debates at the Constitutional Convention centered on how to allocate seats in the National Legislature. Although each state, regardless of population, had been equally represented in the Continental Congress, many now argued that "equal numbers of people ought to have an equal no. of representatives." 1 *The Records of the Federal Convention of 1787* at 179 (Farrand ed. 1937) (statement of James Wilson of Pennsylvania). This debate culminated in the Great Compromise, which allocated seats to the states on the basis of population in one chamber, and irrespective of population in the other.

James Madison confirmed the Framers' intent that House seats should be allocated by population. He expressed the view that "[i]t is a fundamental principle of the proposed Constitution, that ... the aggregate number of representatives allotted to the several States[ ] is to be determined by a federal rule, founded on the aggregate number of inhabitants." *The Federalist*, No. 54 at 368 (Van Doren ed. 1945).

Hence it is clear that the general principle for allocation is that House seats are to be assigned to states based on population. Unlike in the intrastate context, however, this is not the end of the analysis in the interstate context. For the Constitution requires that the general principle of allocation by population be subject to the following constraints: there must be at least one representative per state, and congressional districts cannot cross state lines. These constraints create the so-called fractional interest problem. For instance, when Montana's percentage of the total U.S. population is multiplied by 435, it

should receive 1.404 representatives.[3] Since the Constitution does not permit a representative to be shared between two states, Montana cannot have four-tenths of a representative in Congress. It is impossible, therefore, to follow precisely the general principle of apportionment by population.

James Madison's notes of the Constitutional Convention debate show that the Framers were aware that the scheme they were creating would lead to the fractional interest problem: "A State might have one Representative only, that had inhabitants enough for 1½ or more, if fractions could be applied...." 2 *The Records of the Federal Convention of 1787* at 358 (Farrand ed. 1937) (statement of Oliver Elsworth of Connecticut). The Framers, however, did not include in the Constitution a specific mathematical formula to address the fractional interest problem, and the allocation formula to be used became a point of contention between the First Congress and President Washington. *See* Joseph Story, 2 *Commentaries on the Constitution* § 678–79 (1833).

Justice Story addressed the fractional interest problem in his Commentaries on the Constitution. He first noted that "there can be no subdivision of [a representative]; each state must be entitled to an entire representative, and a fraction of a representative is incapable of apportionment." *Id.* at § 676. Yet Justice Story rejected the notion that if the allocation of House seats could not be accomplished strictly proportionate to population, population should be entirely disregarded. Instead, he reasoned:

> the truest rule seems to be, that the apportionment ought to be the nearest practical approximation to the terms of the constitution; and the rule ought to be such, that it shall always work the same way in regard to all the states, and be as little open to cavil, or controversy, or abuse, as possible.

*Id.* Thus, in evaluating the State's claims, this court must be mindful that representation in the House precisely proportionate to population is impossible under the constitutional plan. Because the goal of any apportionment formula is to be a "practical approximation" to a population-based allocation, merely pointing out that the equal proportions formula leads to population disparities is insufficient to condemn it. Rather, it must be shown that lesser population disparities are possible using another formula.

## IV

The State alleges that the equal proportions formula used to allocate House seats among the states is unconstitutional under Article I, Section 2, of the Constitution. The initial burden is on the State to show that the population differences under the equal proportions formula are avoidable, and that they result from the lack of a good faith effort by Congress to achieve population equity among districts, subject to the constitutional provisions requiring at least one representative per state and barring congressional districts from straddling state boundaries. In my view, the State has failed to meet that burden.

Although the Supreme Court has indeed had occasion to evaluate *intra* state apportionment plans in cases such as *Wesberry* and *Karcher*, the standard of precise numerical equality announced in those cases is impossible to apply here. We engage in a fundamentally different inquiry. Although population equity among districts is a guiding principle, because of the constraints imposed by the Constitution it is impossible to have districts that are even approximately equal in size. Indeed, application of any of the apportionment formulae before this court results in congressional district populations varying by hundreds of thousands of people between states. In intrastate apportionment cases, we must ask the relatively straightforward question: do the districts have the same population? This court has the more complex task of evaluating the relative merits of plans

---

**3.** This number, the exact, unrounded proportion of representation a state would be entitled to if fractions of representatives could be apportioned, is referred to by statisticians as the state's "quota."

which, by necessity, all fall far short of population equality.[4]

Three different formulae for addressing the fractional interest problem are before this court. The currently used Hill "equal proportions" formula rounds upward all fractions that are greater than the geometric mean of the two whole numbers the fraction falls between. The State offers two alternative allocation formulae it contends would reduce population differences among districts. The Adams "smallest divisors" formula rounds all fractions up no matter how small. The Dean "harmonic means" formula rounds fractions upward if the fraction exceeds the harmonic mean of the two whole numbers the fraction falls between. The Adams and Dean formulae, which have in common the fact that their use would result in two House seats being allocated to Montana, are alleged by the State better to serve the constitutional requirement that House seats be allocated by population.

The Adams "smallest divisors" formula, in my view, is clearly inconsistent with the principle that House seats should be allocated to the states by population. Its most obvious defect is that it violates "quota" for four states. That is, it assigns a number of representatives to a state that is neither of the two closest whole numbers to that state's exact, unrounded share of representation. For instance, California's unrounded quota is 52.124; that is, if representatives could be apportioned in fractions, California would be entitled to exactly 52.124 representatives in the next Congress, based on its 1990 census population. Defs.' Ex. 1 at 12 (declaration of Ernst). While there may be room for argument whether California's quota should be rounded down to 52 or up to 53 representatives, surely it could not be plausibly ar-

gued that the House was apportioned according to population if California were allocated only 50 House seats. Yet that is exactly the result compelled by adoption of the Adams plan. *Id.* And California is not an isolated case. Using the Adams formula, Illinois, New York, and Ohio would also receive an apportionment of House seats in violation of their quotas, under the 1990 census. *Id.* at 13.

The Hill "equal proportions" formula, by contrast, has never violated quota in the fifty years it has been in use. *Id.* Every state has always been assigned a number of House seats that is one of the two closest whole numbers to its exact quota. I fail to see how the Adams formula could be said to be more consistent than the Hill formula with the command of Article I, Section 2, that House seats be apportioned to the states based on population.

Nor does application of the Dean "harmonic means" formula show that the Hill "equal proportions" formula leads to unnecessary population differences. The result under the Dean formula is relatively easy to compare to that under the Hill formula because the only difference in seat allocation would be that Washington state's ninth House seat would be reassigned and added to Montana. Pls.' Hill Aff.Ex. G at 1. All other House seat assignments would remain the same under both formulae. This switch of one House seat would *increase* the population variance between the only two states affected. Under the current apportionment using the Hill formula, Montana's congressional district is 48.0% larger than Washington's average district. Using the Dean formula, Washington's districts would become 52.1% larger than Montana's.

---

4. Variance analysis is a less than straightforward inquiry. In testimony before the House Subcommittee on Census and Population in 1980, a former Census Bureau statistician observed that there are at least three ways in which the constitutional command of representation based on population could be translated into a statistical test for allocation formulae: (1) variability from the ideal number of persons per district, (2) variability from the ideal share each

person should have of his representative's vote, or (3) variability of nearness to quota. H.Rep. No. 18, 97th Cong., 1st Sess. 58 (1981). Moreover, variability could be measured both as the absolute variance, or as the variance of the mean squared, which is more typically used by statisticians. *Id.* When the statistician evaluated several allocation formulae, no one formula proved best under all of these measures. *Id.*

The majority states that the "absolute difference from the ideal district is the proper criterion to use in determining whether Congress has met the goal of equal representation for equal numbers of people." *Ante* at 1364. Yet under this criterion, the Hill "equal proportions" formula also performs better than the Dean "harmonic means" formula. Under the Hill formula, Montana has one district that is 231,189 persons larger than the ideal district size. If the Dean formula were used, Montana would have two districts, each 170,638 persons smaller than the ideal, for a total absolute variance of 341,276 from the ideal district size. Likewise, Washington's absolute population variance would *increase* by shifting from the Hill formula to the Dean formula. Under the Hill formula, Washington has nine districts, each 29,361 persons too small, for a total absolute variance of 264,249, while adopting the Dean formula would create eight districts, each 38,527 persons too large, increasing the total absolute variance to 308,216. Interestingly, Montana apparently argues that it can live with a variance of 341,276 persons under the Dean formula, while it insists that its 231,189 person variance under the Hill formula is clearly unconstitutional.

The State puts great stock in the fact that under one measure, the Dean and Adams formulae do perform better than the Hill formula: both the Dean and Adams formulae produce a narrower range between the smallest district and the largest. That is, if one selects the single biggest district and the single smallest district in the country, and compare just those two, the disparity is smaller when using the Dean or Adams formulae than when using the Hill formula.

The analysis cannot be limited, however, to only two of the nation's congressional districts to the exclusion of the other 433. Instead of examining the degree to which just two districts vary from the ideal, a rigorous analysis looks at the variance of every district in the nation. When all 435 districts are considered, the Hill method has the *least absolute population variance* from the ideal district size, compared to either the Dean or Adams methods. Defs.' Ex. 1 at 13 (declaration of Ernst). Moreover, "it can be shown mathematically that the [Hill] equal proportions method minimizes this variance among all apportionment methods and all sets of populations." *Id.* at 14.

In my view, the majority is mistaken in stating that "[t]he Dean method ... best accomplishes the goal of creating districts closest to the ideal district size." *Ante* at 1364. The State's expert did originally claim that "the Dean method produces the smallest variance or standard deviation." Pls.' Tiahrt Aff. at 5. The Census Bureau's expert, however, has pointed out that the State erred by "fail[ing] to take into account the number of districts in each state" when computing their variance analysis.[5] Defs.' Ex. 1 at 13 (declaration of Ernst). The State has conceded this error. *See* Pls.' Br. in Opp'n to Defs.' Mot. for Summ.J. 2 n. 1 ("Plaintiffs do not dispute the factual allegations contained in the Declaration of Lawrence Ernst."). The Census Bureau has persuasively shown that the Hill formula is superior, notwithstanding the State's mistaken belief that the Dean formula produced the least absolute variance. *See* Defs.' Ex. 1 at 13 (declaration of Ernst).

In sum, neither of the formulae proposed by the State lead to less population variance than the Hill "equal proportions" for-

---

5. The reason a variance analysis must account for the number of districts per state is not that there could be variance among the districts within a given state. Indeed, Dr. Ernst's calculations assume that districts within a given state will be evenly sized, as required under *Karcher.* Rather, the necessity of accounting for the number of districts per state is illustrated by the following hypothetical: State A has one district which is 100,000 persons larger than the ideal district. State B has fifty districts, each 10,000 persons larger than the ideal. Under the State's incorrect variance analysis using the average variance for each state, State A's average variance of 100,000 persons is greater than State B's average variance of 10,000 persons. When the number of districts in each state is accounted for, however, State B's variance of 500,000 persons (50 × 10,000) is much larger than State A's variance of 100,000 persons (1 × 100,000).

**1372**

mula in use for the past fifty years. The State, in my view, has failed to demonstrate that a better formula exists than the one chosen by Congress. Surely when the Hill formula leads to the least population variance from the ideal, among the formulae put before this court, it cannot be said that Congress has failed to make a good faith effort to achieve population equality among congressional districts. *Karcher* requires just such a showing by the State, and therefore I conclude that the State has failed to meet its burden of proof.

## V

The State also claims that section 2a of Title 2 of the United States Code is unconstitutional under Article I, Sections 2 and 7, by not allowing legislative consideration of reapportionment. The majority did not reach this claim, but in my view it should be dismissed for failing to state a claim upon which relief can be granted.

First, there is no textual support in Article I, Sections 2 or 7, for the proposition that at each census, Congress must reexamine the mathematical formula it uses to allocate House seats.[6] Article I, Section 2, mandates an "actual Enumeration" every ten years, but gives no hint that Congress must reexamine every ten years the formula it uses to address the fractional interest problem. Section 7 merely recites the process which must be followed for a bill to be enacted into law. It is not alleged that section 2a of Title 2 was enacted in violation of Article I, Section 7, and nothing in section 2a interferes with the process set forth in Section 7 for enacting law. Hence, the constitutional basis for the State's second claim is most unclear.

Second, even if the Constitution does require Congress to reexamine the allocation methodology every ten years, nothing about section 2a of Title 2 prevents such a reexamination. As with any federal statute, Congress is always free to pass superseding legislation that expressly or impliedly repeals section 2a. Indeed, on at

least three occasions since section 2a was passed in 1941, Congress has reconsidered use of the Hill "equal proportions" formula specified in section 2a. In 1948, Congress commissioned a NAS study on allocational formulae, and in 1971 and 1981, subcommittee hearings were held on whether section 2a should be amended. Moreover, to the extent the Montana congressional delegation is alleging that the action of their House and Senate colleagues has prevented consideration and passage of a replacement to the Hill formula, we lack jurisdiction because such claim presents a non-justiciable political question.

Despite the State's characterization of section 2a as an "automatic" allocation scheme that is somehow beyond congressional control, nothing but a lack of political will prevents Congress from repealing or amending section 2a now or in the future to change the allocation formula. That Congress has chosen for the time being not to amend section 2a of the statute does not violate either Sections 2 or 7 of Article I. I would dismiss the State's second claim.

## VI

The Framers could have created a system where congressional districts disregarded state boundaries, in the same way intrastate districts are now drawn across county lines or city limits. This would have largely eliminated the fractional interest problem, since without the constraint of staying within state boundaries, the nation could be divided up into 435 districts each of equal population. But although they recognized the fractional interest problem, the Framers persisted in creating a scheme whereby House seats are assigned to states, not directly to groups of 572,466 people (the current ideal district size), because of the sovereign role the states play in our federal system. Under our scheme of federalism the population within congressional districts must inevitably vary from state to state, and as Justice Story

6. Seldom in constitutional jurisprudence does a court encounter a claim, as here, where there is an utter void of case law. We must perforce make direct recourse to the naked text of the Constitution, a daunting prospect indeed.

instructs us, the best we can seek is "the nearest practical approximation" to the ideal of apportionment exactly proportionate to population. Either of the alternative formulae put forward by the State creates a greater absolute population variance from the ideal district size than the Hill "equal proportions" formula. The State, in my view, has failed to show that the formula mandated by Congress is not "the nearest practical approximation," and hence I would grant defendants' motion for summary judgment.